**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PAULA REZZA, | ) | |
| | ) | |
|    **Plaintiff,** | ) | **No.** |
| | ) | |
| **v.** | ) | |
| | ) | |
| NATIXIS DISTRIBUTORS, L.P. and | ) | <u>**JURY TRIAL DEMANDED**</u> |
| NATIXIS GLOBAL ASSET | ) | |
| MANAGEMENT, L.P. | ) | |
| | ) | |
|    **Defendants.** | ) | |

<u>**COMPLAINT IN CIVIL ACTION**</u>

  NOW COMES the Plaintiff PAULA REZZA, by and through her counsel, Timothy J. Touhy, Esquire and the law firm of Touhy, Touhy, Buehler & Williams LLP and files the following Complaint in Civil Action against Natixis Distributors, L.P. and Natixis Global Asset Management, L.P.:

<u>**Parties and Jurisdiction**</u>

1. Plaintiff, Paula M. Rezza, is an adult resident of the State of Illinois, with an address of 1235 West George Street, Unit 109, Chicago, Illinois 60657. She is a registered investment advisor who was an employee of Defendants from in or about February 2004 until May 6, 2008.

2. Defendant, Natixis Distributors, L.P., an investment company, has a principal place of business at 399 Boylston Street, Boston, MA 02116 and conducted substantial business in the State of Illinois.

3.     Defendant, Natixis Global Asset Management, L.P., has a principal place of business at 399 Boylston Street, Boston, MA 02116, is the parent company of Natixis Distributors, L.P. and conducted substantial business in the State of Illinois.

4.     Hereinafter, Defendants will be collectively referred to as Natixis and/or Defendant.

5.     Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq., as amended (hereinafter referred to as "Title VII") and the Family & Medical Leave Act of 1993, 29 U.S.C. § 2615, to secure full restitution of all lost wages and benefits resulting from Defendants' violation of Sections 2000e-2(a)(1) and (2) and 2000e-3(a) of Title VII, as amended, and Section 2615 of the Family & Medical Leave Act, and for such other relief as may be appropriate.

6.     Defendants are employers within the meaning of Section 2000e(b) of Title VII.

7.     The Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.     Matt Raynor was at times relevant hereto, a manager and supervisor of Plaintiff with a title of National Sales Manager.  Further, at all times relevant hereto, he was acting in the course and scope of his employment with Defendant.

9.     Mark Doyle was at times relevant hereto, a manager and supervisor of Plaintiff with a title of Head of Inside Sales.  Further, at all times relevant hereto, he was acting in the course and scope of his employment with Defendant.

10.    John Hailer was at times relevant hereto, a manager and supervisor of Plaintiff with a title of Chief Executive Officer.  Further, at all times relevant hereto, he was acting in the course and scope of his employment with Defendant.

11.   Danny Santaniello was at times relevant hereto, a manager and supervisor of Plaintiff with a title of National Sales Manager, West Coast.  Further, at all times relevant hereto, he was acting in the course and scope of his employment with Defendant.

12.   On or about July 14, 2008, Plaintiff filed charges of sexual harassment, discrimination and retaliation against Defendants with the Equal Employment Opportunity Commission ("EEOC").  Said filing constituted an initiation of proceedings with the Massachusetts Commission Against Discrimination and the Illinois Department of Human Rights pursuant to and by operation of the work sharing agreement between the EEOC and those agencies.

13.   Plaintiff requested from the EEOC and was issued a Notice of Right to Sue, which was mailed to Plaintiff on May 15, 2009.  A copy of said Notice of Right to Sue is attached hereto as Exhibit "1".

14.   Plaintiff has complied with all conditions precedent to filing this Complaint.

15.   Plaintiff also brings this action for damages she suffered as a direct and proximate result of Defendants' wrongful conduct including, but not limited to, the intentional and negligent infliction of emotional distress, violations of the Illinois Human Relations Act, defamation, interference with prospective contractual and business relations, and wrongful termination.  Plaintiff seeks compensatory, actual and punitive damages as well as injunctive and equitable relief.

16.   The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1332. Alternatively, the Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events giving rise to the claims occurred within this District.

18.     Indeed, Plaintiff's termination and miscarriage both occurred within the State of Illinois and, more specifically, this District.

### Nature of the Case

19.     This case follows Plaintiff's termination the day after she spoke with human resources about her pregnancy and, shortly thereafter, **miscarriage** that occurred as a direct result of the Defendants illegal, inappropriate and discriminatory conduct.   The conduct described herein was conducted, at the very least, with a reckless disregard for Plaintiff's rights, but in reality was far worse, necessitating the imposition of punitive damages.

20.     Further, when Plaintiff was terminated, Defendants illegally used her U-5 as a bargaining chip in the negotiating process.  Such conduct has previously resulted in a member firm having a punitive damages award entered against it for over $1.2 million. Moreover, when Plaintiff refused to sign the release and accept an inadequate offer of $100,000 to compromise her claims, Defendants retaliated against her and placed worse language in her U-5.

### Facts

21.     Plaintiff had been employed in the securities industry for 11 years prior to joining Natixis.

22. Plaintiff had an impeccable reputation before joining Natixis.

23. Plaintiff had worked for 8 years at UBS (PaineWebber, Kidder Peabody) until she was recruited by Natixis.

24. In or about February 2004, Plaintiff was hired by Natixis as a Regional Director and later promoted as a Managing Regional Director.

25. Although Defendant had 18 Regional Directors, Plaintiff was the only woman in the role of Regional Director.

26. No one had claimed prior to Plaintiff joining Natixis that she was a "poor performer". In fact she was not a poor performer.

27. Although originally assigned to the Midwest territory covering Chicago and Wisconsin, shortly after her hiring Defendant expanded the territory to include Illinois, Wisconsin and Minnesota.

28. After beginning at Natixis, Plaintiff's performance steadily improved.

29. Plaintiff's income was tied directly to commissions she obtained from selling Natixis' products, including mutual funds.

30. Typically, Plaintiff was providing a basis point commission / override on the sale of each product.

31. In 2004, Plaintiff earned $158,580.01. Of that, only $75,000 was base salary and the remainder was commissions.

32. In 2005, Plaintiff earned $237,432. Of that, only $75,000 was base salary and the remainder was commissions. Plaintiff was promoted in April, 2005 and her base salary rose from $75,000 to $85,000.

33. In 2006, Plaintiff earned $295,254. Of that only $85,000 was base salary and the remainder was commissions.

34. In 2007, Plaintiff earned $367,440. Of that only $85,000 was base salary and the remainder was commissions.

35. In 2008, Plaintiff's annualized income, had she not been wrongfully terminated would have been $525,240. Again, only a de minimus portion was salary.

36. As noted above, Plaintiff's income continued to steadily rise. Indeed, for the majority of the time, the size of the region she was assigned to did not increase, other than two small additions of additional territory in 2005.

37. Plaintiff's income continued to rise despite that fact that Defendant refused or failed to assign adequate and appropriate resources to her region.

### Plaintiff Takes Her First Maternity Leave and is Written Up after Refusing to Return Early from Maternity Leave

38. In May 2006, Plaintiff went on maternity leave to deliver her first child.

39. Plaintiff was the first and only female Managing Regional Director to take maternity leave.

40. Prior to taking maternity leave, at no point did Defendant claim or otherwise state that Defendant was a "poor performer".

41.     In August 2006, Defendants' agents, servants and/or employees, Matt Raynor and Mark Doyle, requested that Plaintiff meet with them.

42.     At that meeting, Defendants' agents, servants and/or employees, in violation of the law, requested that Plaintiff return from maternity leave early.  Plaintiff refused to do so.

43.     In January 2007, Plaintiff was recognized for her strong sales efforts during a presentation at the National Sales meeting.  Indeed, as noted above, Plaintiff continued to improve her regions' sales.

44.     However, despite that praise, two months later, in March, 2007, Raynor and Doyle provided Plaintiff with a negative performance review claiming that Plaintiff's performance in the quarter following her return from maternity leave was poor.

45.     The performance review was a sham and inconsistent with the Defendant's public pronouncement of Plaintiff's performance as well as her actual performance.

46.     In fact, as set forth above, even though Plaintiff took maternity leave in 2006, Plaintiff's sales increased from the prior year.

### Defendant's CEO, John Hailer, Solicits Sex from Plaintiff

47.     Less than six months later, Plaintiff was subjected to additional illegal conduct by Defendant's CEO, John Hailer.

48.     In August 2007, Plaintiff attended Defendant's National Sales Meeting in Boston, MA.

49.     On August 2, 2007, Plaintiff and others were asked to go to the Rattlesnake bar in Boston.  Plaintiff was advised that they were told to do so by Hailer himself.

50.     A half block before arriving at the bar, Hailer approached Plaintiff.

51.     Hailer stated the following to Plaintiff in front of a witness: "I know this is inappropriate, but I have always found you very attractive.  That's inappropriate isn't it?  But it's true.  How about you and I just go back to the hotel instead of into this bar?"

52.     Plaintiff, who is married, refused Hailer's inappropriate and illegal sexual proposition.  Plaintiff told Hailer: "I love my family and my job, no thank you."

53.     Hailer was not happy about being refused the sexual advance.

54.     Upon information and belief, it is widely known at Defendant that Hailer has sexual relations with employees of the company and, in fact, although married has a mistress with an apartment in Boston.

55.     The following day after the sexual proposition, on August 3, 2007, Plaintiff was attending the National Sales Meeting.

56.     Plaintiff left the meeting briefly to use the restroom.  After leaving the meeting, Hailer followed Plaintiff out of the room.

57.     Hailer acknowledged his discriminatory conduct and stated: "Hey we are cool right?  I didn't mean anything by what I said last night.  We are cool right?  Everything is cool right?"

58.     Knowing it would be career suicide; Plaintiff did not report Hailer's conduct at that time.

59.     Knowing that there is no defense to Hailer's sexual proposition, Defendants have attempted to provide an "alibi" for his whereabouts the night the first incident occurred. The alibi will be demonstrated to be false.

60.     Further, Defendant was aware, through its agents, servants and employees that Plaintiff and her husband were attempting to have a second child.

61.     In mid-September, 2007, Plaintiff learned she was pregnant.

62.     In early-October, 2007, however, Plaintiff began to experience problems with that pregnancy and, in fact, had a miscarriage.

63.     Defendant was aware of that issue through its agents, servants and/or employees.

## Plaintiff is Passed over for a Promotion and Told She Needed to Put Hailer before Her Family

64.     Shortly thereafter, November 2007, Hailer retaliated against Plaintiff for refusing his sexual advances, passing her over for a promotion. Instead, Hailer provided the promotion to one of his close friends, Danny Santaniello, who had no prior management experience.

65.     The month following Santaniello's appointment to the position as Plaintiff's supervisor, in or about December 5-6, 2007, Santaniello requested to travel with Plaintiff on business.

66.     During that travel, Santaniello informed Plaintiff that she needed to put her job before her family. Upon inquiry, Santaniello informed Plaintiff that what that meant was that Plaintiff needed to have a personal relationship with Hailer, the CEO. To start,

Plaintiff was informed that she should begin by providing Hailer with cards and email and then eventually a "personal" relationship.

67.    Plaintiff was informed that she was "failing" in her job because she was putting her family before Hailer.

68.    Plaintiff again refused to engage in an inappropriate relationship with Hailer.

69.    Knowing that his acts were inappropriate and constitute sexual discrimination, Santaniello now denies making any such statements to Plaintiff, but simultaneously, cannot recall his conversations with Plaintiff.

70.    Following that inappropriate overture on behalf of his friend Hailer, Santaniello did not document that he had such a discussion with Plaintiff.  Instead, following Plaintiff's refusal to engage in an inappropriate relationship with Hailer, Santaniello documented that Plaintiff did not have the "skill set" for her job.

71.    Further, Santaniello attempted to retaliate against Plaintiff by suggesting that she be placed on probation.

72.    Within two weeks of that refusal to engage in an inappropriate relationship with Hailer, on December 21, 2007 (and continuing thereafter), Plaintiff was denied resources that she had requested for her territory.

73.    Although other sales territories were provided additional resources, Plaintiff was told that she would be compared with other territories that were provided additional resources.

74.    Santaniello acknowledged to Plaintiff that such an act by Hailer would place Plaintiff at a huge disadvantage when being compared to peers.

75.     Further, although Plaintiff's sales territory was ranked the third best "opportunity" by Defendant, Hailer denied Plaintiff the necessary and requested resources in retaliation for her refusal to engage in an inappropriate sexual relationship with him.

76.     Indeed, the Defendant's actions in simultaneously identifying Plaintiff's territory as an excellent opportunity but also refusing to provide resources to exploit that opportunity are logical inconsistent and evidence of discrimination.

77.     In December 2007, Plaintiff specifically complained to Santaniello about the disparate treatment.

78.     In response, Santaniello acknowledged the disparate treatment and promised Plaintiff that additional resources would be provided for her territory.

79.     Indeed, now that the logical inconsistency in Defendant's actions had been further exposed, Santaniello began singing a different tune about placing Plaintiff on probation, completely abandoning that approach.

80.     Although promised to Plaintiff by Santaniello in early January 2008, the resources were never provided.

81.     Plaintiff continued to operate at a disadvantage as a result of the retaliatory withholding of resources.  However, despite that withholding, from January to May, 2008, Plaintiff's territory ranked in the top ten for the company.

82.     During the first quarter of 2008, Defendant, its agents, servants and/or employees were aware that Plaintiff and her husband were attempting to have a second child.

83.     Defendant, its agents, servants and employees were also aware that Plaintiff had suffered from a miscarriage following the birth of her first child.

84.     Defendant, its agents, servants and employees were also aware of Plaintiff's age.

85.     Defendant, its agents, servants and employees were also aware that, because of Plaintiff's age, she fell into a higher risk category for childbirth complications and/or a miscarriage.

86.     Further, it is commonly and widely known that a woman in her first trimester runs a higher risk of a miscarriage from stress.

**Plaintiff Learns She is Pregnant Again, Reports it to Defendant, is then Fired the Next Day and Shortly thereafter has a Stress Induced Miscarriage**

87.     On or about April 28, 2008, Plaintiff believed that she might be pregnant and, as such, planned on going to the doctor the following day to confirm that fact.

88.     Plaintiff discussed that fact with co-workers.

89.     According to Defendant, later that night on April 28, 2008, Defendant decided to fire Plaintiff. Defendant did not disclose the alleged termination to Plaintiff.

90.     On April 29, 2008, Plaintiff confirmed that she was pregnant. Certain of Defendant's agents, servants and/or employees were informally made aware of that fact.

91.     On the morning of May 5, 2008, Plaintiff officially informed Defendant that she was pregnant by phoning human resources and leaving a voice mail.

92.     At that time, Defendant had still not disclosed any intention of terminating Plaintiff's employment to Plaintiff.

93.     Plaintiff did not immediately receive a response from the human resource department.

94.     Instead, later that day, Santaniello informed Plaintiff that he "had a change in travel plan. I need you to meet me at the Westin in downtown Chicago at 8:30 tomorrow."

95.     Santaniello asked where Plaintiff was located. Plaintiff informed Santaniello that she was in Minnesota on important business. Santaniello requested that she cancel her meetings and return to Chicago early to meet with him.

96.     Plaintiff informed Santaniello that she had important meetings scheduled and asked if the meeting could be by phone. Santaniello told Plaintiff that he wanted to meet in person, but refused to tell Plaintiff what the meeting was about.

97.     Plaintiff continued to go about her business that day. Later in the day, she sent an email to human resources again informing human resources of her pregnancy.

98.     After Santaniello's call to Plaintiff, a human resource representative called back Plaintiff and told her she would be "happy to" provide Plaintiff with necessary documents pertaining to her pregnancy. The human resource representative said nothing to Plaintiff about her impending termination.

99.     That same day, the human resources department admittedly told Santaniello and Raynor that Plaintiff was pregnant.

100.    Despite specifically knowing that she was pregnant, Santaniello and Raynor did nothing to change their course of conduct or otherwise seek to accommodate Plaintiff in any way.

101.    Moreover, Defendants intentionally misled Plaintiff as to the circumstances of the meeting with Santaniello.

102.    On May 6, 2008, Plaintiff met with Santaniello as requested.  To Plaintiff's surprise, Raynor was present with Santaniello.  Santaniello intentionally had not told Plaintiff that Raynor would be present.

103.    Instead, Santaniello hid the fact that Raynor, the National Sales Manager, would be present so that he could cause Plaintiff additional stress and shock upon being ambushed at the meeting.

104.    Santaniello, in fact, did cause Plaintiff severe stress and shock through his actions, as did Raynor.

105.    Santaniello and Raynor told Plaintiff she was fired.  They also discussed Plaintiff's pregnancy with her and specifically told her that her pregnancy "had nothing to do with the termination".

106.    Plaintiff was broadsided by the event and, following the meeting, she returned home suffering from severe stress and anxiety.

107.    Thereafter, Santaniello at least partially falsely documented what occurred at the meeting.

**Defendants Offer Plaintiff $100,000 to Release her Claims and Illegally Use Her U-5 as Bargaining Chip, Conduct that has Previously Resulted in Punitive Damages Being Awarded in Excess of $1.2 Million**

108.    The anxiety and stress would only increase, however, once Plaintiff had the opportunity to actually review the release offered to her.

109.    Although illegal and warranting the imposition of punitive damages, in the release provided to Plaintiff, Defendant specifically made Plaintiff's U-5 a bargaining chip.

110.    The U-5 is a document filed with FINRA following an employee's termination.

111.    A U-5 that contains negative language can serve to blacken a person's reputation and, as courts have found, blackball a person in the securities industry.

112.    As such, the U-5 is specifically prohibited from being used as a bargaining chip in negotiating severances or settlements.

113.    Indeed, the use of a U-5 as a bargaining chip in settlement is considered so offensive that punitive damages in excess of $1.2 million have been assessed against a firm for using the U-5 as a bargaining chip in settling a case.

114.    The case involving the prohibiting on using a U-5 as a bargaining chip is widely known in the securities industry and Defendant cannot claim ignorance of the law as a defense, as ignorance of the law is never a defense.

115.    The rationale for prohibiting a U-5 as a bargaining chip has been explained by a Court as follows:

> "A Form U-5, by necessity, is not to have its contents bartered, as the very purpose of a Form U-5 mandates truthful disclosure as to the reason(s) a registered employee ceases employment. An employer could properly allow an employee the option of resigning as opposed to being fired, but an employer may not attempt to gain an advantage, monetary or otherwise, in exchange for "favorable wording" on a Form U-5. The arbitrator's award found "the panel also believed that the U-5 was improperly used in the termination negotiations in order to manipulate a settlement with Plaintiff."

116.    Indeed, Defendant was not ignorant of the law. Instead, Defendant specifically used the U-5 as a bargaining chip in an effort to leverage a settlement with Defendant and, further, to cause her stress and anxiety, in direct contravention of the law.

117.   Defendant offered Plaintiff $100,000 to release her all of her claims against Defendant.

118.   In the release, Defendant stated that if Plaintiff agreed to release her claims, her U-5 would say: "permitted to resign".

119.   It was blatantly obvious to Plaintiff that if she refused to sign the release, releasing her claims against Defendant that Defendant would retaliate against Plaintiff and place different, less favorable language in her U-5.

120.   Indeed, Defendant was fully aware that the $100,000 offered to Plaintiff was grossly inadequate for a release of all her claims. Using the U-5 as a bargaining chip was just an improper means to try to coerce Plaintiff into accepting inadequate compensation to settle her claims.

121.   The threat to harm Plaintiff's reputation if she did not release her claims, caused Plaintiff significant anxiety, stress and humiliation, in addition to the stress, anxiety and humiliation caused by the circumstances of her termination.

122.   Approximately one week after her termination and during the time period that Defendant was illegally using the U-5 as a bargaining chip, on May 14, 2008, as a direct result of the stress caused by Defendants, Plaintiff had a miscarriage.

123.   The Illinois legislature believes that a death of any unborn child is so serious that it amended its laws, in or about 1980, to provide for a cause of action for wrongful death cause of action on behalf of the deceased child under Section 2.2 of the Illinois Wrongful Death Act.

124. While prior Illinois law had provided for protection of a fetus only at the point of viability, the Illinois legislature changed the law and provided for protection for all unborn children.

**<u>Defendants Retaliate When Plaintiff Refuses to Release Her Claims and Do Not Place the "Permitted to Resign" Language in her U-5, instead choosing to put more Harmful Language in her U-5</u>**

125. Under FINRA's rules, a terminated employee's U-5 must be filed within thirty (30) days. To not do so can subject the Defendant firm to sanctions and is against FINRA's rules and regulations.

126. Defendants did not file Plaintiff's U-5 within thirty (30) days as required.

127. Instead, because Defendants were illegally using the U-5 as a bargaining chip and had offered Plaintiff forty-five (45) days to accept the release, Defendants withheld filing the U-5, holding the filing of the U-5 over her head.

128. On June 20, 2008, Plaintiff informed Defendants in writing that the offer was not accepted.

129. Five days later, on June 25, 2008, Defendants filed the retaliatory U-5 containing the defamatory, false and retaliatory language.

130. Thus, it was only after Plaintiff refused to sign the release that Defendants filed Plaintiff's U-5. Rather than say "permitted to resign", Defendants demonstrated its retaliatory intent by placing language harmful to Plaintiff, i.e., that she had been terminated for "job performance".

131. The acts of Defendants described above and herein were outrageous, willful and shock the conscience. Resultantly, punitive damages are required to deter such conduct in the future.

132. On or about May 18, 2008, Plaintiff received a Right to Sue letter, attached hereto as Exhibit 1. As such, Plaintiff has satisfied all conditions precedent to filing of this action.

## Count I - Sexual Discrimination / Harassment (Quid Pro Quo)

133. Plaintiff incorporates by reference herein Paragraphs 1 through 132 of the within Statement of Claim as if more fully set forth at length.

134. Defendants' conduct described above and herein constitutes sexual harassment and discrimination and is a violation of Title VII.

135. The conduct described above and herein was unwelcome and unwanted and constitutes sexual advances, requests for sexual favors and/or other verbal or physical conduct of a sexual nature.

136. The conduct described above and herein was explicitly and/or implicitly a term or condition of Plaintiff's employment.

137. Submission to the conduct was made either an explicit and/or implicit term or condition of Plaintiff's employment.

138. Submission to or rejection of the conduct was used as a basis for employment decisions affecting Plaintiff.

139. The conduct described had the purpose or effect of unreasonably interfering with

Plaintiff's work performance and/or creating an intimidating, hostile or offensive work environment.

140.    The conduct described above and herein was unlawful sexual harassment committed by Defendants' employees, servants and/or agents who had the effective ability to influence employment actions that could affect Plaintiff, including but not limited to firing, demotion, denial of promotion and denial of income.

141.    As a direct and proximate result of the aforesaid unlawful, willful and deliberate discrimination and harassment against Plaintiff by Defendants, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, adverse effects on her career and diminished earning capacity.

142.    As a direct and proximate result of the of the aforesaid unlawful, willful and deliberate discrimination and harassment against Plaintiff by Defendants, Plaintiff suffered from physical problems, including but not limited to migraines, sleeplessness and anxiety.

143.    By reason of Defendants' aforesaid unlawful, willful and deliberate misconduct towards Plaintiff due to her sex, Plaintiff is entitled to recover from Defendant both compensatory and punitive damages in addition to actual damages.

WHEREFORE, Plaintiff prays for the following:

a.    That Defendants be enjoined from further violations of Title VII and engaging in actions, policies and/or practices that are violations of Title VII;

b.    That Plaintiff be made whole and awarded actual damages, including without limitation, reimbursement of back pay, plus interest, all wages and benefits lost to

which she was otherwise entitled by virtue of her employment, and a reasonable attorney's fee, all in accordance with provisions of Title VII, 42 U.S.C. § 2000e-5(g) and (k);

c. That Plaintiff be awarded compensatory and punitive damages and in accordance with 42 U.S.C. § 1981a(a);

d. That Defendants be taxed with the costs of this action;

e. For such other and further relief as the Panel deems just and proper.

## Count II - Sexual Discrimination (Pregnancy)

144. Plaintiff incorporates by reference herein Paragraphs 1 through 143 of the within Statement of Claim as if more fully set forth at length.

145. Defendants' conduct described above and herein constitutes sexual discrimination / pregnancy discrimination and is a violation of Title VII.

146. Defendants' discriminatory conduct was used as a basis for employment decisions affecting Plaintiff.

147. The conduct described above and herein was unlawful sexual discrimination committed by Defendants' employees, servants and/or agents who had the effective ability to influence employment actions that could affect Plaintiff, including but not limited to firing, demotion, denial of promotion and denial of income.

148. As a direct and proximate result of the aforesaid unlawful, willful and deliberate discrimination against Plaintiff by Defendants, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, adverse effects on her career and diminished earning

20

capacity.

149.  As a direct and proximate result of the of the aforesaid unlawful, willful and deliberate discrimination and harassment against Plaintiff by Defendants, Plaintiff suffered from physical problems, including but not limited to migraines, sleeplessness, anxiety and a miscarriage.

150.  By reason of Defendants' aforesaid unlawful, willful and deliberate misconduct towards Plaintiff due to her sex / pregnancy, Plaintiff is entitled to recover from Defendants both compensatory and punitive damages in addition to actual damages.

WHEREFORE, Plaintiff prays for the following:

a.  That Defendants be enjoined from further violations of Title VII and engaging in actions, policies and/or practices that are violations of Title VII;

b.  That Plaintiff be made whole and awarded actual damages, including without limitation, reimbursement of back pay, plus interest, all wages and benefits lost to which she was otherwise entitled by virtue of her employment, and a reasonable attorney's fee, all in accordance with provisions of Title VII, 42 U.S.C. § 2000e-5(g) and (k);

c.  That Plaintiff be awarded compensatory and punitive damages and in accordance with 42 U.S.C. § 1981a(a);

d.  That Defendants be taxed with the costs of this action;

e.  For such other and further relief as the Panel deems just and proper.

## **Count III - Unlawful Retaliation**

151.    Plaintiff incorporates by reference herein Paragraphs 1 through 150 of the within Statement of Claim as if more fully set forth at length.

152.    The conduct described above and herein constitutes retaliation, in violation of the law, both in Plaintiff's rejection of the unwanted sexual advances and, further, following her reporting of the unlawful conduct of Defendants and its agents, servants and/or employees.

153.    As a direct and proximate result of the aforesaid unlawful, willful and deliberate retaliation against Plaintiff by Defendants, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, adverse effects on her career and diminished earning capacity.

154.    As a direct and proximate result of the of the aforesaid unlawful, willful and deliberate retaliation against Plaintiff by Defendants, Plaintiff suffered from physical problems, including but not limited to migraines, sleeplessness, anxiety and a miscarriage.

155.    By reason of Defendants' aforesaid unlawful, willful and deliberate retaliation towards Plaintiff, Plaintiff is entitled to recover from Defendants both compensatory and punitive damages in addition to actual damages.

WHEREFORE, Plaintiff prays for the following:

a.    That Defendants be enjoined from further violations of Title VII and engaging in actions, policies and/or practices that are violations of Title VII;

b. That Plaintiff be made whole and awarded actual damages, including without limitation, reimbursement of back pay, plus interest, all wages and benefits lost to which she was otherwise entitled by virtue of her employment, and a reasonable attorney's fee, all in accordance with provisions of Title VII, 42 U.S.C. § 2000e-5(g) and (k);

c. That Plaintiff be awarded compensatory and punitive damages and in accordance with 42 U.S.C. § 1981a(a);

d. That Defendants be taxed with the costs of this action;

e. That Plaintiff's U-5 be expunged and/or otherwise reformed; and,

f. For such other and further relief as the Panel deems just and proper.

## Count IV - Intentional Infliction of Emotional Distress

156. Plaintiff incorporates by reference herein Paragraphs 1 through 155 of the within Statement of Claim as if more fully set forth at length.

157. At all relevant times hereto, Defendants acted through its agents, servants and/or employees who were acting within the course and scope of their employment.

158. Defendants' actions were extreme and outrageous.

159. Defendants intended to cause, recklessly or consciously disregarded the probability of causing emotional distress.

160. Defendants caused Plaintiff severe or extreme emotional distress.

161. Defendants' conduct actually and proximately caused the emotional distress.

162. Although Plaintiff need not, under the law, suffer contemporaneous physical injury,

she did, in fact, experience such physical injury.

163. Defendant is liable to Plaintiff not only for compensatory damages but punitive damages to deter such conduct in the future.

WHEREFORE, for the foregoing reasons Plaintiff demands that judgment be entered in her favor and against Defendants in an amount in excess of $75,000 with punitive damages assessed.

## **Count V - Negligent Infliction of Emotional Distress**

164. Plaintiff incorporates by reference herein Paragraphs 1 through 163 of the within Statement of Claim as if more fully set forth at length.

165. Defendants owed Plaintiff a duty of care.  Although Plaintiff need not prove that a heightened duty exist to establish liability, given the circumstances, Defendants owed Plaintiff a heightened duty of care.

166. Defendants breached the duty of care.

167. Defendants' negligence was the proximate cause of Plaintiff's physical injury or illness.

168. Plaintiff suffered damages as a result thereof.

169. Defendants are liable to Plaintiff for compensatory damages and punitive damages to deter such conduct in the future.

WHEREFORE, for the foregoing reasons Plaintiff demands that judgment be entered in her favor and against Defendants in an amount in excess of $75,000 with punitive damages assessed.

## <u>Count VI – Sexual Discrimination (Hostile Work Environment)</u>

170. Plaintiff incorporates by reference herein Paragraphs 1 through 169 of the above as if more fully set forth at length herein.

171. Defendants' conduct described above and herein constitutes sexual harassment and discrimination and is a violation of Title VII.

172. The conduct described above and herein was unwelcome and unwanted and constitutes sexual advances, requests for sexual favors and/or other verbal or physical conduct of a sexual nature.

173. The conduct described above and herein was explicitly and/or implicitly a term or condition of Plaintiff's employment.

174. Submission to the conduct was made either an explicit and/or implicit term or condition of Plaintiff's employment.

175. Submission to or rejection of the conduct was used as a basis for employment decisions affecting Plaintiff.

176. The conduct described above and herein had the purpose or effect of unreasonably interfering with Plaintiff's work performance and/or creating an intimidating, hostile or offensive work environment.

177. The conduct described above and herein was gender-based, unwelcome conduct of supervisors and co-workers.  Such conduct, as described above, included:

178. The unwelcome and unlawful conduct based on sex was both subjectively abusive to Plaintiff and also objectively severe and pervasive enough to create a work environment that a reasonable person would find abusive.

25

179.    Such conduct, as described above and herein was frequent, severe, pervasive, physically threatening and humiliating, interfered with work performance, had an adverse effect on Plaintiff and other female workers psychological well-being and was conducted by harassers who were superiors in the organization.

180.    As a direct and proximate result of the aforesaid unlawful, willful and deliberate discrimination and harassment against Plaintiff by Defendant, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, adverse effects on her career and diminished earning capacity.

181.    As a direct and proximate result of the aforesaid unlawful, willful and deliberate discrimination and harassment against Plaintiff by Defendants, Plaintiff suffered from physical problems, including but not limited to migraines, sleeplessness and anxiety.

182.    By reason of Defendants' aforesaid unlawful, willful and deliberate misconduct towards Plaintiff due to her sex, Plaintiff is entitled to recover from Defendants both compensatory and punitive damages in addition to actual damages.

WHEREFORE, Plaintiff prays for the following:

a.      That Defendants be enjoined from further violations of Title VII and engaging in actions, policies and/or practices that are violations of Title VII;

b.      That Plaintiff be made whole and awarded actual damages, including without limitation, reimbursement of back pay, plus interest, all wages and benefits lost to which she was otherwise entitled by virtue of her employment, and a reasonable

attorney's fee, all in accordance with provisions of Title VII, 42 U.S.C. § 2000e-5(g) and (k);

c.      That Plaintiff be awarded compensatory and punitive damages and in accordance with 42 U.S.C. § 1981a(a);

d.      That Defendants be taxed with the costs of this action;

e.      For such other and further relief as the Panel deems just and proper.

## Count VII – Discrimination – State Law Violations

183.    Plaintiff incorporates by reference herein Paragraphs 1 through 182 of the above as if more fully set forth at length herein.

184.    Plaintiff's filing with the EEOC constituted an initiation of proceedings with the Massachusetts Commission Against Discrimination and the Illinois Department of Human Rights pursuant to and by operation of the work sharing agreement between the EEOC and those agencies.

185.    Defendant is liable to Plaintiff for violating the Illinois Human Relations Act (775 ILCS 5/) and M.G.L. 151B.

186.    Defendant is liable for all damages stemming from the unlawful discrimination.

WHEREFORE, Plaintiff prays for the following:

a.      That Defendants be enjoined from further violations the acts and engaging in actions, policies and/or practices that are violations of the acts;

b.      That Plaintiff be made whole and awarded actual damages, including without limitation, reimbursement of back pay, plus interest, all wages and benefits lost to

which she was otherwise entitled by virtue of her employment, and a reasonable attorney's fee, all in accordance with the acts;

c. That Plaintiff be awarded compensatory and punitive damages;

d. That Defendants be taxed with the costs of this action;

e. For such other and further relief as the Panel deems just and proper.

## Count VIII - Defamation

187. Plaintiff incorporates by reference herein Paragraphs 1 through 186 of the above as if more fully set forth at length herein.

188. The U-5 filing made by Defendants is defamatory.

189. The U-5 filing was made with actual knowledge of its falsity, with a reckless disregard of the truth and/or with malice.

190. Despite the fact that Defendants knew the U-5 to be false, Defendants have refused and/or failed to correct or expunge the U-5 language and/or mitigate the damage being caused to Plaintiff.

191. The statements in the U-5 were and are intended to mislead and do mislead the reader about Plaintiff's capabilities.

192. Defendants are fully aware that prospective employers have a duty to and, indeed do, access the U-5 before hiring. Thus, Defendants are fully aware that the entry made about Plaintiff has and will have an adverse effect on Plaintiff, her reputation and career.

193.    Every time the U-5 is accessed, the defamatory entry is re-published and constitutes another violation of the law and serves as a re-publication of the defamatory U-5 entry.

194.    The U-5 is only protected by a qualified privilege, if any.

195.    Defendants' actions are not protected by any justification or privilege and/or Defendants abused any privilege that might attach to such publications.

196.    The statements in the U-5 are defamatory per se and, as such, Plaintiff need not establish actual damages. However, that having been said, Plaintiff has been caused, by Defendants' wrongful acts, to suffer significant financial harm as a result of Defendants' acts.

197.    Under the circumstances set forth above and herein, punitive damages are warranted against the Defendants to deter or prevent such future conduct from occurring and to send Defendants a message that such conduct is reprehensible, impermissible and improper.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that judgment by rendered in his favor and against Defendants in an amount in excess of $75,000 with punitive damages and costs assessed.

### Count IX – Intentional Interference with Prospective Contractual / Business Relations

198.    Plaintiff incorporates by reference herein Paragraphs 1 through 197 of the above as if more fully set forth at length herein.

199.    The U-5 is, as set forth above, now contained in a database that is routinely accessed by prospective employers.

200.    The false language contained in the U-5 has the effect of interfering with Plaintiff's ability to switch and/or obtain future employment.

201.    Defendants did not have any privilege or justification for such false statements in the U-5 and/or abused any privilege that Defendants may have possessed.

202.    Defendants' acts cause Plaintiff, on an ongoing basis, to prohibit future contractual relationships and/or business relations.

203.    Further, the false U-5 entry interferes with Plaintiff's ability to form contracts on an ongoing basis with any securities firm.  Indeed, any time Plaintiff seeks employment with another securities company, the securities company will access and view the false U-5 entry.

204.    That U-5 entry, on an ongoing basis, prevents Plaintiff from forming contractual relations, there is no privilege or justification for such false statements (and/or Defendant abused any such privilege), the acts have caused Plaintiff to lose and/or form contracts and have caused Plaintiff actual harm.

205.    Under the circumstances set forth above and herein, punitive damages are warranted against the Defendants to deter or prevent such future conduct from occurring and to send Defendants a message that such conduct is reprehensible, impermissible and improper.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that judgment by rendered in his favor and against Defendants in an amount in excess of $75,000 with punitive damages and costs assessed.

## **Count XI – Violations of the Family & Medical Leave Act of 1993**

206. Plaintiff incorporates by reference herein Paragraphs 1 through 205 of the above as if more fully set forth at length herein.

207. Defendants, at all times relevant hereto, employed more than 50 employees for each working day during each of the 20 or more calendar weeks in each calendar year relevant hereto.

208. Plaintiff had been employed with Defendants for more than 12 months prior to her informing Human Resources of her pregnancy and requesting information pertaining to applying for medical leave as a result of the pregnancy and serious medical condition and had worked more than 1250 hours in the 12 months preceding her request.

209. On or about May 5, 2008, Plaintiff officially informed Defendants, through the Human Resource Department, that she was pregnant and requested information pertaining to applying for medical leave under the Family & Medical Leave Act of 1993 ("FMLA"), 29 U.S.C.A. § 2615 because she was expecting a child and had a serious medical condition.

210. On or about May 6, 2008, Defendants terminated the Plaintiff's employment in violation of the FMLA by interfering with Plaintiff's attempt to exercise her rights under the statute.

211. Defendants' conduct was also discriminatory on the basis of Plaintiff availing herself of her protected family and medical leave rights and was in retaliation for her attempt to exercise her rights under the Act.

212.    As a result of Defendant's violations of the FMLA, Plaintiff is entitled to damages for economic and non-economic losses and attorneys' fees and costs pursuant to 29 U.S.C.A. § 2617(a)(1)(A) and 29 U.S.C.A. § 2617(a)(3).

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that judgment by rendered in his favor and against Defendants in an amount in excess of $75,000 with attorneys' fees and costs assessed.

## Count XII – Injunctive / Equitable Relief

213.    Plaintiff incorporates by reference herein Paragraphs 1 through 212 of the above as if more fully set forth at length herein.

214.    The language contained in the U-5 restricts Plaintiff's ability to be gainfully employed in the securities industry and serves to blacken her reputation and tarnish her securities license.

215.    As a result, specific equitable relief is required as the language contained in the U-5 must be stricken, expunged and/or reformed.

216.    The language in the U-5 must be expunged from the CRD and/or any other databases.

217.    Without such relief, Plaintiff has and will continue to harmed and damaged by the actions of Defendants.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that equitable / injunctive relief be granted in her favor and against Defendants and that her U-5 be expunged in the CRD and/or any other databases due to its defamatory nature.

**Jury Demand**

Plaintiff demands a trial by jury of any issue triable of right by a jury by filing this demand which is indorsed upon the plaintiff's complaint.

Dated:  August 12, 2009                    Respectfully submitted,

                                           /s/Timothy J. Touhy____
                                           Timothy J. Touhy
                                           Touhy, Touhy, Buehler & Williams, LLP
                                           55 West Wacker Drive, Suite 1400
                                           Chicago, Illinois  60601
                                           (312) 372-2209
                                           (312) 456-3838 facsimile
                                           ttouhy@touhylaw.com